Peter E. Perkowski (SBN 199491)
peter@perkowskilegal.com
PERKOWSKI LEGAL, PC
515 S. Flower Street, Suite 1800
Los Angeles, CA 90071
Tel.: (213) 340-5796

Ronald M. Daignault (pro hac vice)
Chandran B. Iyer (pro hac vice)
Raymond W. Mort, III (pro hac vice)
Erin Hadi (pro hac vice)
Taylor Lepore (pro hac vice)
Richard Juang (pro hac vice)
DAIGNAULT IYER LLP
8229 Boone Boulevard, Suite 450
Vienna, VA 22182
Tel.: (917) 838-9795

Attorneys for Plaintiff
AVATIER IP, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| AVATIER IP, LLC, | Case No.: 2:25-cv-03640-AB SK |
|---|---|
| *Plaintiff*, | *Hon. André Birotte Jr.* |
| v. | **AVATIER IP, LLC'S OPENING CLAIM CONSTRUCTION BRIEF** |
| MICROSOFT CORPORATION, | |
| *Defendant*. | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................... 1

II.   BRIEF TECHNICAL INTRODUCTION ......................................... 2

III.  ARGUMENT ..................................................................................... 3

    A.    The Court is not required to construe claim terms. ............................ 3

    B.    Construction of the disputed claim phrases. ...................................... 5

        a.    The '207 Patent and '750 Patent. ........................................ 5

            1.    "identifying attributes associated with a computing device" (Claim 1 of both the '207 and '750 Patents) ......................... 5

            2.    "credential provider code" (Claims 1, 2, and 6 of both the '207 and '750 Patents) ........................................................ 6

            3.    "credential provider code was previously configured to recognize a mobile device" and "credential provider code recognizes the mobile device" (Claims 1 and 2 of both of the '207 and '750 Patents) ......................................... 8

            4.    "mobile device was selected for authentication purposes" (Claim 1 of both of the '207 and '750 Patents) .................... 9

            5.    "a protocol for communicating with the mobile device" (Claim 1 of both of the '207 and '750 Patents) .................. 11

            6.    "first authentication data" (Claim 1 of the '207 Patent) ..... 13

            7.    "second authentication data" (Claim 1 of the '207 Patent). 15

            8.    "entity initiating the authentication process" (Claim 3 of both of the '207 and '750 Patents) ...................................... 16

            9.    "authentication factor associated with the user (Claim 1 of the '750 Patent) ................................................................. 17

        b.    The '397 Patent ................................................................. 18

            1.    "private username" (Claim 1 of the '397 Patent) ............... 18

            2.    "private password" (Claim 1 of the '397 Patent) ............... 19

c.   '273 Patent......................................................................20

1.   "private user identity" (Claim 8 of the '273 Patent)............20

2.   "automatically generated" and "automatically generating"
     (Claim 8 of the '273 Patent).................................................21

d.   The '166 Patent and '103 Patent .................................................22

1.   "submitting log-on information to said computer causing
     said computer to use said log-on information to provide to
     said user access to said protected network so that the user
     can use the protected network via the computer" (Claim 10
     of the '103 Patent and Claim 11 of the '166 Patent)...........22

2.   "whether the user is authorized to use the computer" and
     "whether the user is authorized to use the computer
     associated with the communication device" (Claim 12 of the
     '103 Patent and Claim 13 of the '166 Patent)....................23

IV.   CONCLUSION ...........................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ........................................................... 4

6
7

*Allvoice Devs. US, LLC v. Microsoft Corp.*,
   988 F. Supp. 2d 1248 (W.D. Wash. 2013) ........................................ 12

8
9

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   726 F.3d 1296 (Fed. Cir. 2013) ...................................................... 9, 14

10
11

*AstraZeneca AB v. Mylan Pharm. Inc.*,
   19 F.4th 1325 (Fed. Cir. 2021) ........................................................... 8

12

*Azurity Pharm., Inc. v. Alkem Labs. Ltd.*,
   133 F.4th 1359 (Fed. Cir. 2025) ....................................................... 24

13
14

*EON Corp IP Holdings LLC v. Aruba Networks Inc*,
   62 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................... 24

15
16

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) ........................................................... 3

17
18
19

*Illumidine, Inc. v. Hestan Smart Cooking, Inc.*,
   No. 8:25-cv-00328-CAS-DFMx, 2025 U.S. Dist. LEXIS 262121
   (C.D. Cal. Dec. 17, 2025) .................................................................. 12

20

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ......................................................... 11

21
22

*Ironburg Inventions Ltd. v. Valve Corp.*,
   64 F.4th 1274 (Fed. Cir. 2023) ........................................................... 1

23
24

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .................................................. 9, 17, 23

25
26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) .................................................. 3, 4, 6

27
28

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008) ..................................................... 7, 15

*Oplus Techs., Ltd. v. Vizio, Inc.*,
    No. 2:12-cv-05707, 2012 WL 5519198 (C.D. Cal. Oct. 31, 2012) ..................... 3

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ........................................................ 10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................ 1, 6, 9, 17

*Sci. Applications v. Zipline Int'l, Inc.*,
    No. 22-cv-04480-JSC, 2023 U.S. Dist. LEXIS 121585 (N.D. Cal.
    July 14, 2023) ................................................................................ 6

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ......................................................... 5

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ....................................................... 22

*In re Varma v. IBM Corp.*,
    816 F.3d 1352 (Fed. Cir. 2016) ......................................................... 6

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .................................................... 7, 15

*Williamson v. Google Inc.*,
    No. 15-cv-00966-BLF, 2017 U.S. Dist. LEXIS 118205 (N.D. Cal.
    July 27, 2017) .............................................................................. 23

Pursuant to the Court's August 6, 2025, Scheduling Order (Dkt. No. 49) and the Stipulation Modifying Patent Related Dates (Dkt. No. 47), Plaintiff Avatier IP, LLC ("Plaintiff" or "Avatier") respectfully submits this Opening Brief on Claim Construction. Microsoft Corporation ("Defendant" or "Microsoft") is the party seeking constructions for all fifteen (15) of the terms discussed in this brief.

## I.    INTRODUCTION

This case involves six patents relating to Avatier's innovative computing device authentication technology: U.S. Patent Nos. 12,250,207 ("the '207 patent"), 11,811,750 ("the '750 patent"), 10,623,397 ("the '397 patent"), 9,686,273 ("the '273 patent"), 8,499,166 ("the '166 patent"), and 8,225,103 ("the '103 patent") (collectively the "Asserted Patents", Exs. 1-6 hereto).

As this Court is aware, the "general rule" of claim construction is that courts should give disputed phrases their "ordinary and customary meanings." *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005). If disputed phrases use common, non-technical words, the court may determine that their ordinary meanings are readily apparent and require no further construction. *See Ironburg Inventions Ltd. v. Valve Corp.,* 64 F.4th 1274, 1287 (Fed. Cir. 2023).

Microsoft identified all disputed terms for construction, *not* Avatier. Avatier seeks to retain the plain and ordinary meanings of claim language in response to Microsoft's proposed constructions, which are a scattershot of *fifteen* explanations or articulations masked as the alleged plain and ordinary meaning of the claim terms "in view of the intrinsic evidence." *See* Dkt. 58. But none of Microsoft's disputed claim terms need any sort of construction or deviation from what was issued by the United States Patent and Trademark Office ("USPTO") after rigorous examination. Microsoft's litigation-driven constructions manufacture non-infringement positions that are wrong under every cannon of claim construction. Microsoft's proposals should be rejected, and the existing language of Avatier's patent claims should be maintained.

## II.    BRIEF TECHNICAL INTRODUCTION

To confirm that Microsoft's proposed constructions violate the cannons of claim construction, only an initial review of the technical background of the Asserted Patents is needed.

Each of the six Asserted Patents relates to authentication of the users of a computing device. Among the six Asserted Patents, there are two groups that share common priority relationships and corresponding disclosure—**Group (1):** '207 and '750 Patents (directly related to one another through continuation practice); '397 and '273 Patents (directly related to one another through divisional practice, and related to the '207 and '750 Patents through a common provisional); **Group (2):** '166 and '103 Patents (directly related to one another through continuation practice).

**Group (1):** Taking the '750 Patent as generally representative of Group (1), it discloses a technique "that integrates authentication from a mobile device (e.g., using biometrics, social informational data, questions and answers, and more) to allow login to laptops and desktops . . . using local Wi-Fi or any other similar protocol and/or connected to Internet without USB." Ex. 2, '750 Patent, Abstract. The technique "provides a cloud clearinghouse that ties a person's or entity's mobile device(s) to an identity that's used to authenticate a person (could be the same person) on a laptop, desktop, or similar computer system." *Id.*

The cloud clearinghouse (as depicted in Figure 16) is disclosed as the orchestrator of the authentication, wherein in certain embodiments "cloud universal identification server 1602 receives data which reflects answers to or satisfaction of the authentication factors from mobile device 1604. Subsequently, cloud universal identification server 1602 confirms such received data by comparing and matching such data with data previously stored on the storage of cloud universal identification server 1602." *Id.* at 13:11-17. The result of this disclosed process is "[a]fter confirming the authentication of entity 1604, cloud universal identification server 1602 transmits to computing device 1606, informational data causing the login

2

1   process to be successful." *Id.* at 13:21-24.

2      **Group (2):** Taking the '166 Patent as generally representative of Group (2), it

3   discloses a "system for controlling access to a protected network includes a network

4   access control module." Ex. 5, '166 Patent, Abstract. The disclosed system

5   "includes a communication device associated with the computer" to which the user

6   is attempting to login and that communication device "automatically transmits a

7   unique identifier . . . to the network access control module." *Id.* Thereafter, "the

8   network access control module receives the unique identifier… authenticate[s] the

9   communication device . . . and submit[s] log-on information to a log-on interface of

10  the computer associated with the communication device so that the user can access

11  the network via the computer." *Id.*

12  **III.    ARGUMENT**

13     "Courts do not rewrite claims; instead, [they] give effect to the terms chosen

14  by the patentee." *Helmsderfer v. Bobrick Washroom Equip., Inc.,* 527 F.3d 1379,

15  1383 (Fed. Cir. 2008) (citing *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed.

16  Cir. 1999)); *Oplus Techs., Ltd. v. Vizio, Inc.,* No. 2:12-cv-05707, 2012 U.S. Dist.

17  LEXIS 165308, at *3 (C.D. Cal. Oct. 31, 2012). The central purpose of claim

18  construction is to clarify "disputed meanings and technical scope," and "when

19  necessary to explain what the patentee covered by the claims." *O2 Micro Int'l Ltd.*

20  *v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Claim

21  construction "is not an obligatory exercise in redundancy." *Id.*

22     **A. The Court is not required to construe claim terms.**

23     Microsoft characterizes its proposed constructions as a further explanation or

24  articulation of the plain and ordinary meaning "in view of the intrinsic evidence."

25  *See* Dkt. 58. Avatier's position is that there is no need for any such alleged

26  articulation; the existing "plain and ordinary" meaning of the terms controls as

27  already expressed in the claim language. *Id.* The motivation for Microsoft's position

28  is to force Avatier to respond with an articulation of its own different from that

3

examined and approved by the USPTO, all in an apparent attempt to rely on *O2 Micro*. See *O2 Micro Int'l Ltd.*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

The problem with Microsoft's approach is there is not more than one "ordinary" meaning for any of the disputed terms. *Contra id.* Considering specifically the circumstances of *O2 Micro*—the claim term at issue was "only if." *Id.* at 1360-1361. A simple term expressed in standard English. But resolution of the scope of "only if" was significant because the parties disputed whether the language allowed for *exceptions* (i.e. more than one meaning). *Id.* Microsoft is unable to identify a remotely similar issue with the claim terms here. And Microsoft will not be able to explain how there is legal error in rejecting its proposed constructions disguised as "articulations." *Contra Id.* at 1358 (discussing legal error).

Beyond this, Microsoft's proposals improperly re-write and narrow the terms, despite their attempted positioning as nothing more than an explanation of plain meaning "in view of the intrinsic evidence." It is not legal error to reject improper proposals in favor of retaining the existing language of the claims, where that language does not require additional construction and the meaning is already clear. *See e.g.*, *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("The district court did not err in concluding that these terms have plain meanings that do not require additional construction. ActiveVideo's proposed construction erroneously reads limitations into the claims and the district court properly rejected that construction and resolved the dispute between the parties.") (citing *O2 Micro*); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("'Being provided to' is comprised of commonly used terms; each is used in common parlance and has no special meaning in the art. Because the plain and ordinary meaning of the disputed claim language is clear, the district court

4

did not err by declining to construe the claim term.").

**B. Construction of the disputed claim phrases.**

This brief is organized by the patent groupings as presented in the Joint Claim Construction Statement (Dkt. 58). These groupings slightly vary as compared to **Group (1)** and **Group (2)** discussed above in the Technical Introduction section.

**a. The '207 Patent and '750 Patent.**[1]

**1. "identifying attributes associated with a computing device"**
**(Claim 1 of both the '207 and '750 Patents)**

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "information that uniquely identifies a computing device that is stored in the cloud universal identification server" |

Microsoft's proposal introduces a narrow *unique* identification requirement, but the claim language only requires an *association*. The claims state "associated" and do *not* use the term "unique" anywhere. The common specification only uses the term "unique" in two places—both of which relate to a *user* and not a computing device. *See* Ex. 2, '750 Patent, 4:47-53; 7:63. Further, the claims use "association" in other places, and Microsoft does not seek construction of those terms and try to inject the requirement of "unique."[2] Microsoft also fails to identify any prosecution history to support a disclaimer or disavowal. *See* Dkt. 58, Attachment A, Term 1.

Microsoft's elaborate proposal also introduces a storage requirement "*in the cloud universal identification server.*" But the claims solely require storage "*at a*

---

[1] Unless specifically noted, discussion in this section applies equally to the '207 and '750 Patents due to claim language and specification overlap. Just as in the Joint Statement, the specification of the '750 patent is referenced as exemplar. In the limited situations of an exception, the '207 patent's content is specifically noted.

[2] Claim 1 of the '750 patent: "receiving and storing, at the cloud universal identification server, registration information that associates a mobile device with the plurality of identifying attributes associated with the user"; "an authentication factor associated with the user"; "authentication factor associated with the user." Claim 1 of the '207 patent: "first authentication data associated with the user."

cloud universal identification server." Microsoft's proposal appears to require physical storage *within* the "cloud universal identification server" instead of merely storage by *reference*. But even if that is not hidden intent behind Microsoft's "in" proposal, Microsoft's proposal improperly introduces ambiguity and indefiniteness, which is exactly what the claim construction process is intended to avoid. *O2 Micro*, 521 F.3d at 1360-62; *Sci. Applications v. Zipline Int'l, Inc.*, No. 22-cv-04480-JSC, 2023 U.S. Dist. LEXIS 121585, at *6-7 (N.D. Cal. July 14, 2023) ("Here, the intrinsic record resolves any ambiguity as to the meaning of 'noise.'")

Consistency counsels against the narrowing Microsoft proposes. *See Phillips* 415 F.3d at 1316; *see also In re Varma v. IBM Corp.*, 816 F.3d 1352, 1363 (Fed. Cir. 2016). The claims elsewhere require storage "*at* a cloud universal identification" in relation to the "identifying attributes." *See* Ex. 2, '750 Patent, Claims 10, 19; Ex. 1, '207 Patent Claims 10, 19. Likewise, the relevant specification disclosure relating to storage of "identifying attributes" provides no support for Microsoft's narrow storage *within* requirement. Ex. 2, '750 Patent, 10:22-24; 13:40-42. Microsoft tries to read limitations into the claims; and just like its narrowing "unique" requirement, Microsoft fails to identify any prosecution history to support a disclaimer or disavowal. *See* Dkt. 58, Attachment A, Term 1.

### 2.  "credential provider code"

### (Claims 1, 2, and 6 of both the '207 and '750 Patents)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "code previously installed on a user's computing device that allows the credential provider to authenticate the user." |

Microsoft's proposal introduces a new functional requirement where the "credential provider code" "*allows* the credential provider *to authenticate the user*." But the only functional requirements in the claims are for: "the request being *received* from credential provider code" (Claim 1, 10, 19); "*transmitting* for delivery

to the credential provider code" (Claim 1, 10, 19); "credential provider code *recognizes* the mobile device" (Claim 2, 11). Even more problematic, Microsoft's proposal appears to limit the actual authentication function to the end computing device itself, and not in combination with/by the credential provider. This contradicts the claim language and specification, and excludes embodiments. *See* Ex. 2, '750 Patent, 13:21-31 (discussing authentication controlled by the cloud universal identification server); 13:61-14:1 (same). *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (explaining that a claim interpretation that excludes a preferred embodiment from the scope of the claim "is rarely, if ever, correct.").

Microsoft's new functional limitation is also inconsistent with the intrinsic evidence from the prosecution history, where Applicant traversed § 112 rejections relating to "credential provider code," its installation, and embodiments concerning its interaction with the "cloud universal identification server" during the authentication process. *See* Ex. 7, Selected 941 Patent Prosecution; 11/10/2020 Final Rejection, pp. 2-5 (Avatier_MS000075-78); 11/4/2020 Applicant Response, pp. 9-10 (applicable remarks that were deemed persuasive) (Avatier_MS0000110-111); 7/23/2021 Notice of Allowance, pp. 2-3 (discussing 11/4/2020 Applicant remarks as persuasive) (Avatier_MS000038-39).

Additionally, Microsoft's proposal introduces an antecedent-basis issue by its reference to "*the* credential provider." There is no "credential provider" feature in the claims. As such, Microsoft's "articulation" introduces ambiguity where the jury will be left to assume Microsoft's proposal is meant to refer to the entity maintaining and controlling the claimed "cloud universal identification server." *See AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1342 (Fed. Cir. 2021)

1  (finding that Defendant's proposed construction added uncertainty under claim

2  scope).

3         **3.  "credential provider code was previously configured to**

4         **recognize a mobile device" and "credential provider code**

5         **recognizes the mobile device"**

6         **(Claims 1 and 2 of both of the '207 and '750 Patents)**

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "[a/the] mobile device was previously registered with the credential provider code previously installed on the computing device." |

11      Microsoft's proposed construction adds a *registration* requirement in place of

12  the broader *recognition* requirement of the existing claim language. The difference

13  here is material and narrower, as demonstrated by the issued claim language.

14  Registration is a rigid and formal recording of the mobile device with the credential

15  provider code under Microsoft's proposal. Whereas the existing language merely

16  requires the credential provider code to be configured to, and capable of,

17  *recognizing* the mobile device. This is accomplished through means including but

18  not limited to registration. That scope is evident in the *dependent* claims, which

19  narrow the claimed "recognition" to being accomplished via "registration":

20  "wherein such credential provider code *recognizes* the mobile device *via a previous*

21  *registration* of the mobile device to the credential provider code". Ex. 2, '750

22  Patent, Dependent Claim 2, 11.

23      Here, Microsoft's "articulation" improperly imports a dependent-claim

24  limitation—i.e., a species ("registration")—into the independent claims, which

25  require only the broader genus ("recognition"). *See Phillips*, 415 F.3d at 1315;

26  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here

27  the limitation that is sought to be 'read into' an independent claim already appears in

28  a dependent claim, the doctrine of claim differentiation is at its strongest.").

Any attempt by Microsoft to argue "recognition" and "registration" are interchangeable concepts is confirmed as wrong by the dependent claim language, and patentee's use of "registration" as a claim concept elsewhere to the exclusion of "recognition"—"the identity of the computing device with one of previously *registered* computing devices, *registered* at the cloud universal identification server" ('750 Patent Claim 1, 10, 19)[3]; "a plurality of computing devices associated with the user are *registered* at the cloud universal identification server" ('750 Patent Claim 8, 17). Other dependent claims even expressly use the "registered" in relation to "mobile devices" with the "cloud universal identification server"—"a plurality *of mobile devices* associated with the user are *registered* at the cloud universal identification server." (Claim 8, 18).

Microsoft is simply wrong. Any resort to an argument that there is only a "registration" embodiment is also wrong. *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013) (explaining that claims are not limited to embodiments disclosed in the specification, even where the specification describes only one embodiment) (citing *Liebel-Flarsheim*, 358 F.3d at 906). And, just as elsewhere, Microsoft fails to identify any prosecution history to support a disclaimer or disavowal. *See* Dkt. 58, Attachment A, Term 3.

### 4.  "mobile device was selected for authentication purposes" (Claim 1 of both of the '207 and '750 Patents)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
| --- | --- |
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "the user selects to log in via a mobile device after the credential provider code presents the option to the user." |

Microsoft's proposal inserts two requirements: (1) user interaction/credential provider code presentation of an option to the user, and (2) specific sequencing.

---

[3] The '207 patent does not include "registration" in its independent claims.

9

Both are wrong.

The dependent claims confirm Microsoft's "articulation" seeks to directly contradict limitations in those claims. Specifically, dependent claim 3 is directly in conflict with Microsoft's prosed user-initiated narrowing: "wherein the entity *initiating the authentication* of the process *is not the user*." *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (rejecting a claim construction that "would render several dependent claims meaningless"). The dependent claims confirm the independent claims cover non-user interaction—scope Microsoft is attempting to eliminate entirely.

It follows that the independent claims do not require the credential provider code to present anything for selection by the user to initiate the authentication process. And the language is in the passive voice: "was selected." The entity performing the selection is not express in the claims—exactly as demonstrated by the dependent claims. Microsoft is simply wrong.

Any resort to an argument that there is only a user-selection embodiment is also wrong—the specification includes embodiments without user interaction first. *See e.g.*, Ex. 2, '750 Patent, 11:14-24.  And, just as elsewhere, Microsoft fails to identify any prosecution history to support a disclaimer or disavowal. *See* Dkt. 58, Attachment A, Term 4.

Concerning the sequencing, the claims have no such sequencing by their plain language. Again, the language is in the passive voice—"was selected"—with no specific timing of that selection. Beyond this, Claim 1 is a method claim and includes none of the requirements for enforcing any kind of sequencing of its claimed steps in this respect. *See Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one").

### 5. "a protocol for communicating with the mobile device"

### (Claim 1 of both of the '207 and '750 Patents)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "the formal specification that defines the procedures to follow when transmitting and receiving data to communicate with the mobile device, including the format, timing, sequence, and error checking used." |
| | Examples of "a protocol for communicating with the mobile device" include Internet, Intranet, USB, Wi-Fi, or Bluetooth. |

Microsoft's proposal improperly seeks to recharacterize the claimed "protocol for communicating" as an electronic *format* for communicating, not as a generally understood mechanism of communicating as actually claimed. The claims in this respect are already clear and only require (1) "retrieving, from a database, a protocol for communicating with the mobile device" and (2) "transmitting, by the cloud universal identification server and in accordance with the retrieved protocol." The "protocol for communicating" is simply the *how* part of the mechanism for communicating—there is no intrinsic evidence requiring selection of a particular "*format*" or "*formal specification*," as Microsoft proposal adds to the claims.

The lack of intrinsic evidence is confirmed by Microsoft's reliance on a litany of extrinsic dictionary definitions, which the Court is well aware carry little to no weight. Particularly because the Federal Circuit has cautioned that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification". *Illumidine, Inc. v. Hestan Smart Cooking, Inc.*, No. 8:25-cv-00328-CAS-DFMx, 2025 U.S. Dist. LEXIS 262121, at *7 (C.D. Cal. Dec. 17, 2025); *Allvoice Devs. US, LLC v. Microsoft Corp.*, 988 F. Supp. 2d 1248, 1254 (W.D. Wash. 2013).

Even those curated dictionary definitions do not support Microsoft's *format* or *formal specification* requirements, including where Microsoft sought out definitions of "communications protocol" where the claim language is "protocol *for communicating*." *See* Ex. 8, Microsoft Dictionary Definitions; Merriam-Webster's Collegiate Dictionary (11th ed. 2014) (definition of "protocol" of "a set of conventions governing the treatment" which then *narrows* to an exception of "esp. the formatting of data in an electronic communication system" as well as "a detailed plan of a scientific or medical treatment, treatment, or *procedure*") (emphasis added)[4]; Microsoft Computer Dictionary (5th ed. 2013) (definition of "communications protocol" which differs from the claim language and also specifically admits that, "[t]he word *protocol* is often used, sometimes confusingly, in reference to a multitude of standards affecting different aspects of communication, such as file transfer . . . , handshaking . . . , and network transmissions" (emphasis in original); as well as "protocol" which merely refers back to "communications protocol"); Newton's Telecom Dictionary (27th ed. 2013) (definition of "protocol" that expressly supports a broader understanding as already present in the claims—"[p]rotocols define the rules by which devices talk with each other" which then *narrows* to an exception of "*or* more formally, a protocol is a set of rules governing the format of messages that are exchanged between computers and people"); Dictionary of Computer Networking (1st ed. 2011) (definition of "communications protocol" of simply "a standard way of communicating between computers or between computers and terminals"); Dictionary of Computing (6th ed. 2010) (definition of "communications protocol" which differs from the claim language and broadly defines as "the parameters that define *how* the transfer of information will be controlled"; as well as "protocol" as merely "the pre-agreed signals, code and rules to be used for data exchange between systems").

---

[4] Unless noted otherwise, all emphasis is added.

One specific dictionary among Microsoft's delicately curated collection is the source of Microsoft's narrowing language of "the formal specification that defines the procedures to follow when transmitting and receiving data to communicate with the mobile device, including the format, timing, sequence, and error checking used." *See* Ex. 8, Dictionary of Computer Networking (1st ed. 2011) (definition of "protocol"). But this "protocol" definition does not definitively say *"must"* (as imported by Microsoft) and instead merely states "[p]rotocols define the format, timing, sequence, and error checking used on a network." *Id.* As in they *can* or *may*. The reason is because not all protocols enforce timing or sequencing. And not all protocols include error checking—particularly not those in Microsoft's own set of examples ("Internet, Intranet, USB, Wi-Fi, or Bluetooth"). For example, communications over the Internet using the User Datagram Protocol ("UDP") provide "no guarantee of delivery, ordering, or duplicate protection." *See* Ex. 9, User Datagram Protocol (UDP) Wikipedia (wayback machine as of 2015).

### 6. "first authentication data"

### (Claim 1 of the '207 Patent)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "information previously stored in the storage of the cloud universal identification server that permits the server to authenticate the user." |

Microsoft's proposal for "first authentication data" introduces two limitations not in the issued claim language: (1) storage, and (2) previous generation. Both are wrong, and Microsoft is unable to identify any intrinsic or extrinsic evidence to support its proposed narrowing.

Concerning storage, there is no requirement that the "first authentication data" is stored before transmission. The only requirement is transmission—"transmitting, by the cloud universal identification server and in accordance with the retrieved protocol, first authentication data." The claims otherwise make clear that the

13

1  patentee intended for storage to be a limitation in relation to other aspects of the

2  claimed method—"receiving and *storing* . . . a plurality of identifying attributes . . .

3  one or more identifying attributes associated with a computing device" ('207

4  Claim 1). The specification is likewise non-limiting in this respect and specifically

5  indicates storage of authentication factors (as the "first authentication data"

6  transmitted to the mobile device) is only one embodiment. *See e.g.*, Ex. 2, '750

7  Patent, 12:63-13:2 ("In an embodiment, in response to identifying computing device

8  1606, mobile device 1604, and their relationship, cloud universal identification

9  server 1602 transmits to mobile device 1604 authentication factors associated with

10 the entity 1608. In an embodiment, the authentication factors were previously stored

11 in the storage of the cloud universal identification server 1602."). *See Ariosa*

12 *Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013) (finding

13 that claims are not limited to embodiments in the specification even when there is

14 only one embodiment).

15     As a corollary, the claims do not require previous generation or existence of

16 the "first authentication data" before transmission. The only requirement is

17 transmission—"transmitting, by the cloud universal identification server and in

18 accordance with the retrieved protocol, first authentication data." And the "first

19 authentication data" is only required to be "associated with the user." The

20 specification specifically contemplates real-time authentication factors (as the "first

21 authentication data" transmitted to the mobile device), which are not generated in

22 advance. *See* Ex. 2, '750 Patent, 13:17-20 ("In an embodiment, cloud universal

23 identification server 1602 receives data which reflects answers to or satisfaction of

24 the authentication factors from mobile device 1604 . . . . In another embodiment,

25 cloud universal identification server 1602 confirms such received data by comparing

26 and matching such data with data on the Internet in real-time."). Exclusion of such

27 embodiments is improper. *Oatey Co. v. IPS Corp.*, 514 F.3d at 1277; *Vitronics*

28 *Corp.* 90 F.3d 1576 at 1583.

14

Just as elsewhere, Microsoft also fails to identify any prosecution history to support a disclaimer or disavowal for either of its proposed narrowing requirements of "first authentication data." *See* Dkt. 58, Attachment A, Term 6.

### 7. "second authentication data"

### (Claim 1 of the '207 Patent)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "authentication data responsive to first authentication data." |

Microsoft's proposal for "second authentication data" rewrites the plain language to require it be "responsive to first authentication data." The claims do not include such a direct responsive/causal coupling between the two. At most the '207 Patent claims require receipt of the "second authentication data" from the mobile device *after* the "first authentication data" is transmitted by the "cloud universal identification server" for delivery to the mobile device. The plain language only requires a general sequencing—not a specific responsive/causal tight coupling as Microsoft requires by its improper "articulation."

The specification confirms this exact understanding of the claimed general sequencing between the first and second "authentication data"—the second is *after* the first. *See e.g.*, Ex. 2, '750 Patent, 13:21-24 ("*After* confirming the authentication of entity 1604, cloud universal identification server 1602 transmits to computing device 1606, informational data causing the login process to be successful.").

Additionally, as with other Microsoft proposals, the claims themselves demonstrate the patentee specifically claimed direct responsiveness with respect to other aspects Microsoft ignores—confirming Microsoft's specific responsive/causal tight coupling is not what the issued plain language means—"*in response* to the request indicating that the mobile device was selected for authentication purposes, retrieving, from a database" (Claim 1); "*upon receiving*, at the cloud universal identification server and from the mobile device, second authentication data,

transmitting" (Claim 1).

Lastly, just as elsewhere, Microsoft fails to identify any prosecution history to support a disclaimer or disavowal to specifically require its proposed responsive/causal tight coupling between the first and second "authentication data." *See* Dkt. 58, Attachment A, Term 7.

### 8.  "entity initiating the authentication process"

### (Claim 3 of both of the '207 and '750 Patents)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "a user initiating the authentication process." |

Microsoft's proposal is the exact opposite of what is claimed in Dependent Claim 3 where this term appears: "wherein the entity *initiating the authentication* of the process *is not the user*." Microsoft will be unable to identify any authority to nullify a negative claim limitation in the dependent claim. *See* 35 U.S.C. §112(d) ("a claim in dependent form shall contain a reference to a claim previously set forth and *then specify a further limitation of the subject matter claimed*"); *see also Phillips*, 415 F.3d at 1315; *Liebel-Flarsheim* 358 F.3d at 910.

Microsoft also fails to identify any prosecution history to support such an extreme disclaimer or disavowal, because there is none. *See* Dkt. 58, Attachment A, Term 8. Microsoft would also be wrong if it attempts to argue there is only a user selection embodiment, and thus the user must be the "entity initiating the authentication." The specification includes embodiments without user interaction first. *See e.g.*, Ex. 2, '750 Patent, 11:14-24.

Patentee's selection of the broader term "entity" should stand without any supposed "articulation."

///

///

### 9. "authentication factor associated with the user

### (Claim 1 of the '750 Patent)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "information previously stored in the storage of the cloud universal identification server that permits the server to authenticate the user." |

Just as with its proposal for "first authentication data," Microsoft's rewrite of the plain language introduces a static concept to authentication data that is not present in the plain language of the claims. The discussion of why Microsoft's "articulation" of "first authentication factor" is equally applicable to this term above, and Avatier directs the Court to that discussion for this "authentication factor" term.

Further, specific to this term in the '750 Patent, the independent claims demonstrate the "authentication factor associated with the user" that is transmitted to the mobile device is (1) not previously stored, and (2) is not statically defined and can be dynamic:

> transmitting, by the cloud universal identification server and in accordance with the retrieved protocol, an *authentication factor associated with the user, the authentication factor for delivery to the mobile device,* and *the authentication factor obtained or derived from at least one authentication factor associated with the user previously stored in the storage* of the cloud universal identification server

As shown above, the "authentication factor associated with the user" that is transmitted to the mobile device (annotated in **red**) is "obtained or *derived*" by "at least one authentication factor associated with the user previously stored in the storage" (annotated in **blue**). As such, Microsoft's proposal reads breadth directly out of the claim itself, which is fundamentally improper.

///

///

17

1

        **b.**    **The '397 Patent**

2

           **1. "private username"**

3

          **(Claim 1 of the '397 Patent)**

4

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "username generated by the system that is inaccessible and unknown to said user" |

8      Microsoft's proposal directly reads an embodiment of the specification into

9 the claims without justification. The source of Microsoft's proposal is the

10 specification section that reads: "The system also automatically creates a system

11 secret or private identity such as a secret username and secret, highly securely

12 generated password, both of which are unknown and inaccessible to the user." Ex. 3,

13 '397 Patent, 2:5-8. This section does not rise to the level of lexicography given its

14 use of "such as" (i.e., as an example). Even if it is an example of lexicography—it is

15 only for the term "secret identity" and *not* "private identity."

16      First, the specification references "secret" and "private" as alternatives—

17 "[t]he system also automatically creates a system *secret or private identity*." Second,

18 if there is any lexicography here, it is specific to "secret identity" by the repeated

19 use of the term "secret" in the description Microsoft seeks to import: "*secret*

20 username and *secret*, highly securely generated password, both of which are

21 unknown and inaccessible to the user."

22      Specification disclosure in the same column confirms everything Microsoft's

23 wants to import relates to "secret identity" and not "private identity": "The *secret*

24 identity, such as *secret* username and password, is stored in an lightweight directory

25 access protocol (LDAP) server or database or in a distributed cloud database system.

26 The system also maps the login identity provider user name to the *secret* user name

27 and password for subsequent usage." *Id.* at 2:8-13. Likewise, similar disclosure as

28 above solely uses the term "secret.":

1
2
3
4
5

> The system also automatically creates an system *secret* username and *secret*, highly securely generated password, both of which are unknown and inaccessible to the user. The *secret* username and password are stored in an lightweight directory access protocol (LDAP) server or database or in a distributed cloud database system. The system also maps the login identity provider user name to the *secret* user name and password for subsequent usage.

6   *Id.* at 3:12-20; Abstract (identical); 4:10-19 (similar, directed to sSSO embodiment);

7   4:20-27 (similar, directed to sSSO embodiment); 4:49-55 (similar, directed to sSSO

8   embodiment); 5:49-52 (similar, directed to sSSO embodiment).

9       Microsoft may pivot to the language in the claims that states "a private user

10  identity *stored in a second storage*, wherein the second storage *is only accessible by*

11  *the computer system*" to support the "inaccessible and unknown to said user" aspect

12  of its proposal. But that language only precludes access by any system other than the

13  "computer system" in the claims. It does not preclude access by the claimed "user"

14  when using the "computer system." That would be entirely "secret" and not just

15  "private"—which is not what is claimed.

16      Stated more simply, the claimed "private username" is not limited in its scope

17  to be completely hidden or *secret* from the user under all circumstances. If it were,

18  the patentee would have claimed it that way, consistent with the "secret" disclosure

19  of the specification discussed above.

20      And, just as elsewhere, Microsoft fails to identify any prosecution history to

21  support a disclaimer or disavowal to limit "private" to "secret." *See* Dkt. 58,

22  Attachment A, Term 1.

23              **2. "private password"**

24          **(Claim 1 of the '397 Patent)**

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "password generated by the system that is inaccessible and unknown to said user" |

28

19

The discussion above regarding Microsoft's proposal for "private username" is directly applicable to "private password," and Avatier directs the Court to that discussion. There is no basis to add the limitations Microsoft inserts into its purported "articulation."

### c.    '273 Patent

#### 1.  "private user identity"

#### (Claim 8 of the '273 Patent)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "username and password generated by the system that are inaccessible and unknown to said user" |

The discussion above regarding Microsoft's proposals for "private username" in the '397 Patent is directly applicable to "private user identity" in the '273 Patent, and Avatier directs the Court to that discussion. The specification of the '273 Patent is identical in relevant part to that of the '397 Patent, and the claims are nearly identical in relevant part.

Beyond the referenced discussion above, Microsoft's articulation for "private user identity" goes a step further and requires a username *and* password. Even all the aspects of the specification Microsoft attempts to read into the claims treat any identity as a username, and *not* a username in combination with a password. Given the technology and the title of the patent, patentee clearly understood when passwords were implicated or not, and expressly claimed their involvement when desired. *See* Claims 4 and 11. Microsoft's attempted bolt-on of passwords has no support anywhere.

This includes the prosecution history Microsoft identified. *See* Ex. 10, Selected 273 Patent Prosecution. Nothing in these aspects of the '273 Patent prosecution history implicates narrowing "private user identity" to "secret," or narrow it to also include a password. They also do not impact the '397 Patent on the

20

same issues—understanding Microsoft failed to identify them as relevant in the Joint Claim Construction Statement in any event.

## 2. "automatically generated" and "automatically generating" (Claim 8 of the '273 Patent)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
| --- | --- |
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "generat[ed/ing] without any intervening user or system administrator interaction" |

Microsoft's proposed negative limitation is improper absent a clear and unmistakable disclaimer or an express definitional statement in the intrinsic record. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope"). Microsoft does not identify any prosecution history to support a disclaimer or disavowal. *See* Dkt. 58, Attachment A, Term 2. The prosecution history Microsoft does identify does not speak to the issue of private user identity at all—or its automatic generation as claimed. *See* Ex 10, Selected 273 Patent Prosecution, pp. Avatier_MS000863-867 (remarks by Applicant – none of which focus on generation of private user identity language). There is likewise no definitional statement in the specification or anywhere else in the intrinsic record. Instead, the specification and the claims themselves merely disclose or claim automatic generation of the private identity from the end-user perspective— "wherein the private user identity was previously automatically generated *when the user initially was registered*." ('273 Patent, Claim 8).

///

///

d.  **The '166 Patent and '103 Patent[5]**

1.  **"submitting log-on information to said computer causing said computer to use said log-on information to provide to said user access to said protected network so that the user can use the protected network via the computer"**

(Claim 10 of the '103 Patent and Claim 11 of the '166 Patent)

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
| --- | --- |
| Plain and Ordinary Meaning | Plain and ordinary meaning in view of the intrinsic evidence, which is "submitting log-on information to said computer to gain access to the protected network causing said computer to use said log-on information to provide to said user access to said protected network so that the user can access the protected network via the computer" |

Microsoft's proposal inserts two instances of "access" that are not otherwise present in the existing phrase as follows:

> submitting log-on information to said computer to gain access to the protected network causing said computer to use said log-on information to provide to said user access to said protected network so that the user can use access the protected network via the computer

Patentee was aware of the difference between "access" and "use" and specifically chose "use" over "access" as the result of this claim feature. What is more, the claims of the '103 Patent were amended during prosecution to eliminate "access" in favor or "use":

> computer to use said log-on information to provide to said user access to said protected network associated with the communication device so that the user can access use the protected network via the computer.

---

[5] Unless specifically noted, discussion in this section applies equally to the '166 and '103 patents due to claim language and specification overlap. Just as in the Joint Statement, the specification of the '166 patent is referenced as exemplar. In the limited situations of an exception, the '103 patent's content is specifically noted.

1   *See* Ex. 11, 2/18/2011 Preliminary Amendment (Avatier_MS000461-468)

2   (amendment of independent claims, including ultimately issued Claim 10 as then

3   pending Claim 12).

4       Microsoft is trying to unwind a specific amendment to the claims during

5   prosecution. Microsoft is wrong and its proposal runs directly against that

6   prosecution history and the intended scope of the claims. *Liebel-Flarsheim*, 358

7   F.3d at 911; see also *Williamson v. Google Inc.*, No. 15-cv-00966-BLF, 2017 U.S.

8   Dist. LEXIS 118205, at *15-16 (N.D. Cal. July 27, 2017).

9       Microsoft may pivot to the specification and make an argument concerning a

10  single embodiment that focuses on "access" and not the broader concept of "use."

11  See e.g., Ex. 5, '166 Patent, 3:35-39. But none of that disclosure confirms any sort

12  of disclaimer or disavowal of scope, particularly in view of the express amendments

13  made during the prosecution of the earlier filed '103 Patent. *See Azurity Pharm.,*

14  *Inc. v. Alkem Labs. Ltd.*, 133 F.4th 1359, 1366-67 (Fed. Cir. 2025) (application of

15  earlier filed patent prosecution history to later patent).

16          **2. "whether the user is authorized to use the computer" and**

17             **"whether the user is authorized to use the computer**

18             **associated with the communication device"**

19          **(Claim 12 of the '103 Patent and Claim 13 of the '166 Patent)**

| Avatier's Proposed Construction | Microsoft's Proposed Construction |
| --- | --- |
| Plain and Ordinary Meaning | Plain and Ordinary meaning in view of the intrinsic evidence, wherein determining "whether the user is authorized to use the computer" is distinct from authenticating the user. |

24      Microsoft's proposal seeks to establish an express distinction between

25  authentication and authorization that is not present in the plain language. The term

26  "authorized" only appears in the dependent claims of each of the '103 and '166

27  Patents, including Claims 12 and 13 at issue here. *See* Ex. 6, '103 Patent, Claims 2,

28  13 and Ex. 5, '166 Patent, Claims 4, 13 (where each of these dependent claims have

nearly identical language). The claim scope is such that authentication of a user is co-extensive with authorization, provided the authenticated user is authorized to use the computer. *See e.g.*, Ex. 6, '103 Patent, Claim 12 ("verifying whether the user is authorized to use the computer associated with the communication device based on the access control rules."). And, in the case of both method claims at issue here, the confirmation of authorization is claimed as an additional step in the method.

There is no objective reason to add Microsoft's express distinction. The only reason is to manufacture some sort of technical non-infringement defense, which is not the appropriate inquiry at the claim construction stage. *EON Corp IP Holdings LLC v. Aruba Networks Inc.*, 62 F. Supp. 3d 942, 952-53 (N.D. Cal. 2014) ("The Court will not, however, use the accused product or the infringement contentions as any kind of evidence in construing the claims."). This is particularly true because the specification is already perfectly consistent with the existing method claim language that adds authorization verification as an *optional* additional step. *See* Ex. 5, '166 Patent, 8:4-8 ("In another embodiment, the log-on interface 204 can serve as a single sign-on service, that is, once the user 130 is authenticated (and optionally authorized), the log-on inter face 204 can provide access to other protected resources, e.g., web pages, for which the user 130 is authorized."); *see also* 7:26-34; 5:30-33.

Lastly, Microsoft may argue its proposal somehow reduces confusion for a lay jury. There is no confusion to reduce or eliminate—authorization verification is set forth in dependent claims with additional method steps, precisely as already explained in the specification.

## IV.   CONCLUSION

For all the foregoing reasons, Avatier respectfully requests the Court to resolve the dispute between the parties by rejecting each of Microsoft's "articulations" by retaining the existing language of Avatier's patent claims. There is no objective reason for any construction or modification of that language.

Dated: February 11, 2026       **PERKOWSKI LEGAL, PC**

**DAIGNAULT IYER LLP**

By:    /s/ Peter Perkowski
       Peter E. Perkowski

       Attorneys for Plaintiff
       AVATIER IP, LLC

25